# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                  Case No: 8:23-cr-140-KKM-AAS

GERARD ERIC BEASLEY,

    Defendant.

_____

## ORDER

    A grand jury indicted Gerard Eric Beasley—a felon—for possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). *See* Indictment (Doc. 1). Beasley moves to suppress the firearm, his initial confession, and "any derivative evidence." Mot. to Suppress (MTS) (Doc. 35) at 1. Beasley contends that the initial confession was coerced and that the firearm was only discovered because of (1) the coerced confession, and (2) a warrantless search of his vehicle in violation of the Fourth Amendment. *Id.* I deny Beasley's motion as to the firearm and any derivative evidence resulting from the search of his vehicle, but agree that his initial confession must be suppressed.

## I.   FACTUAL FINDINGS[1]

On March 17, 2023, at around 10:30 PM, Tampa Police Department Officer Gino Cincotta conducted a traffic stop of a black Nissan Sentra driven by Mr. Beasley. Hr'g Tr. at 23:1–25:19. After following Beasley for roughly a block, Cincotta initiated the stop because Beasley's vehicle did not have its headlights on,[2] and because the vehicle's loaded trunk was partially open and appeared to be unsecured. *Id.* at 23:7–15, 24:4–25:2; Cincotta Body-Worn Camera Video (BC) (Doc. 53-1) at 22:30:51.[3] Upon Cincotta engaging his emergency lights, Beasley parked—partially in the driveway of a nearby residence, partially on an adjacent public sidewalk. Hr'g Tr. at 25:3–10; BC at 22:31:08–18.

After pulling the Sentra over, Cincotta activated his spotlight, exited his patrol cruiser, and approached the driver's side window to question Beasley. Hr'g Tr. at 25:11–19; BC at 22:30:54–22:31:21. Upon approaching, Cincotta immediately observed the smell of marijuana emanating from the Sentra. Hr'g Tr. at 25:20–26:25. Cincotta told Beasley that he had stopped him because of the unsecured trunk. *Id.* at 59:8–11; BC at 22:31:24–32. Beasley explained that he was on his way to the residence to have the trunk fixed. Hr'g Tr.

---

[1] The facts recounted here are based on witness testimony, video evidence, and a recorded phone call presented at the evidentiary hearing on August 9, 2023.

[2] Although Beasley now claims that his lights were on, he admitted the opposite during a phone call while in custody. Recorded Call (RC) (Doc. 53-2) at 9:27–37.

[3] Citations to Cincotta's body-worn camera footage refer to the video's internal timestamp, located in the top right-hand corner of the frame.

at 59:12–15; BC at 22:31:24–30. Because Cincotta did not consider the trunk to be a "big deal," he told Beasley not to worry about a ticket "or anything crazy" on that account. Hr'g Tr. at 59:16–18, 61:22–62:1; BC at 22:31:22–32.

Cincotta next asked for a driver's license and confirmed that Beasley did not possess one. Hr'g Tr. at 25:20–26:3; BC at 22:31:32–22:32:00. After being provided an alternative form of identification, Cincotta explained that he was "not too worried about" the lack of a license either. BC at 22:21:33–43. Noting that the Sentra "smelled like weed," Cincotta then asked whether Beasley had a state-issued medical marijuana card, which he admitted that he did not, and whether Beasley had smoked earlier that evening, which he dodged, blaming the smell on his "wife." *Id.* at 22:32:27–33; Hr'g Tr. at 26:18–25. Cincotta also asked whether there was any marijuana in the vehicle, which Beasley denied. BC at 22:32:28–37.

As backup had arrived, Cincotta returned to the cruiser and entered Beasley's identification information into his dashboard computer while another officer spoke with Beasley, a process that took about three minutes. *Id.* at 22:32:42–22:35:30. The second officer confirmed Cincotta's initial observation about the smell of marijuana and identified a bag containing suspected cannabis products and a prescription bottle. *Id.* at 22:35:12–22:35:24. Based on these observations and Beasley's admitted lack of a medical marijuana card, Cincotta decided to detain Beasley and search the Sentra. *Id.* at

22:35:25–50; Hr'g Tr. at 34:18–24. Explaining that a search of the car was about to occur, Cincotta told Beasley: "alright real quick man, long story short, obviously, you don't have a license, alright, and it smells like weed. So what I'm going to do is I'm going to detain you for a second, and we're going to search the car and make sure there ain't nothing crazy, and then you'll be good to go." BC at 22:35:57–22:36:06. After Beasley explained that the Sentra's primary driver, Ednecia Durden,[4] was headed to the residence, Cincotta further assured Beasley: "that's fine, I'm not worried about the weed. If you got [sic] a little bit of weed in here, you're not going to jail for some stupid-a** weed, alright? I just want you to be honest and upfront with me, that's why I'm asking." *Id.* at 22:36:10–17. Immediately afterward, Beasley replied that "actually, [there's] a weapon in here, it belongs to her." *Id.* at 22:36:17–20. Upon learning of the weapon, Cincotta told Beasley "okay, that's fine, we'll take care of it, alright? What I'm gonna do is I'm still gonna detain you, alright? We're gonna detain you, as long as you're cool with me we'll get it figured out, and we'll go from there, alright? Alright, man, jump out for me. You're gonna face the doorway, okay? Where's that gun at—is it a gun?" *Id.* at 22:36:20–37. Beasley replied that the gun was in the Sentra's backseat pouch and was then detained while police recovered the gun. *Id.* at 22:36:36–43.

---

[4] At the suppression hearing, Durden testified that although she drove the Sentra, her daughter owned it. Hr'g Tr. at 8:21–25.

About twenty minutes after the above conversation, Cincotta returned to the cruiser and attempted to read Beasley his *Miranda* warnings. Beasley interrupted—repeating much of the contents of a *Miranda* warning and explaining that he was familiar with them—but Cincotta eventually finished reading Beasley all of the *Miranda* warnings. *Id.* at 22:58:15–22:59:18. Beasley then agreed to answer questions without an attorney present and confessed to possession of a firearm. *Id.* at 22:59:18–23:01:50. He also confessed that the prescription bottle contained marijuana and crack cocaine. *Id.* at 23:04:51–23:05:52.

Beasley was arrested for possession of a firearm by a felon, possession of cocaine, and possession of drug paraphernalia in violation of Florida law. MTS at 8. The State did not pursue charges, but the United States indicted Beasley on the felon-in-possession charge. *Id.* The pending motion to suppress followed.

## II.  LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. To object to a search under the Fourth Amendment, a defendant must have a common-law property interest or a reasonable expectation of privacy in the area searched. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). A defendant bears the burden of proving that he had a reasonable expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). "If the accused successfully establishes an

expectation of privacy, the burden then shifts to the government to prove that the search was reasonable based upon a recognized exception to the warrant requirement." *United State v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

"[A] confession, in order to be admissible, must be free and voluntary . . . ." *Bram v. United* States, 168 U.S. 532, 542 (1897) (quotations and citations omitted). I evaluate voluntariness based on the totality of the circumstances, and "[t]he burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).

## III.   ANALYSIS

Beasley moves to suppress the firearm, along with "any derivative evidence," as the fruit of an unconstitutional search. MTS at 1. He also moves to suppress his initial confession. *Id.* The United States responds that Cincotta had probable cause to stop Beasley, that the police did not prolong the stop and instead lawfully searched the Sentra under the automobile exception to the warrant requirement, and that Beasley's confession was not coerced. *See generally* Resp. to MTS (Doc. 44). I begin by addressing Beasley's Fourth Amendment challenge to the search of the Sentra.

### A. Beasley has Fourth Amendment Standing

Colloquially referred to as the "standing" inquiry, a defendant who seeks to suppress evidence based on the Fourth Amendment must first establish that he had either a

common-law property interest or a reasonable expectation of privacy in the area searched.

*Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018); *Jardines*, 569 U.S. at 5. Beasley asserts

two forms of standing to challenge the search of the Sentra. First, Beasley claims that he

has standing based on his lawful control of the Sentra at the time of the stop. MTS at 14.

The United States does not dispute this argument, Hr'g Tr. at 123:5–9, and I agree that

Beasley has standing via lawful control, *see United States v. Cohen*, 38 F.4th 1364, 1369

(11th Cir. 2022) ("For [Fourth Amendment] standing purposes, it is typically enough that

the driver is operating a vehicle with the permission of the owner.").

Second, Beasley argues that he has standing based on a claim that he parked the

Sentra within a residence's curtilage. MTS at 8–13, 16–18. As this theory of standing can

have substantive implications for the applicability of the automobile exception, *see Collins

v. Virginia*, 138 S. Ct. 1663, 1675 (2018) ("[W]e conclude that the automobile exception

does not permit an officer without a warrant to enter a home or its curtilage in order to

search a vehicle therein."), I address it in the alternative. Curtilage standing has two

elements. First, because Beasley does not allege that he formally owned or rented the

residence, MTS at 17 (describing the residence as one only that Beasley "frequented and

occasionally stayed at), he must establish a reasonable expectation of privacy in the

residence by showing that he possessed "an unrestricted right of occupancy or custody and

control of the premises as distinguished from occasional presence on the premises as a mere

guest or invitee." *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999) (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)). Second, Beasley must demonstrate that the Sentra was within "[t]he area 'immediately surrounding and associated with the home' " at the time of the search. *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

The failure to prove either element is conclusive, so I begin with the clearer ground upon which Beasley lacks curtilage standing: the Sentra was not within the residence's curtilage. This conclusion is easy. In the Eleventh Circuit, whether a search was conducted within the curtilage "turns on four fact-intensive inquiries: '(1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation.' " *United States v. Bruce*, 977 F.3d 1112, 1121 (11th Cir. 2020) (quoting *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006)). In *Collins*, the Supreme Court held that a motorcycle parked and stored inside the top portion of a driveway directly abutting a home, enclosed on three sides by two car-height brick walls and a wall of the home itself, was within the curtilage. 138 S. Ct. at 1670–71. In doing so, the Court emphasized that the "conception defining the curtilage is familiar enough that it is easily understood from our daily experience." *Id.* at 1671 (cleaned up).

8

Precedent, daily experience, and simple common sense all suggest that the Sentra was not within the curtilage. Footage from Cincotta's body-worn camera shows that, although the Sentra was partially pulled into the residence's driveway, a significant portion of its chassis—including the open trunk and most of both rear wheels—was jutting out onto a nearby public sidewalk. *See* BC at 22:35:50–53. As a result, an ordinary person walking down that section of the sidewalk would not only have observed the Sentra—including the contents of its trunk—he would have had to change course to avoid running directly into the vehicle. That a significant portion of the Sentra was parked on a public sidewalk means that the second *Taylor* factor cuts strongly against Beasley. 458 F.3d at 1206.

So too, the third and fourth factors. *See id.* The bottom portion of the driveway where the Sentra was partially parked was enclosed on, at most, two sides. A car-height wooden privacy fence appears to enclose the highest portion of the driveway toward the rear of the property, and a waist-high slat-fence separates the driveway from the next residence's yard on the right. *See* BC at 22:35:48–53. The bottom-left side of the driveway, however, is unenclosed, and the entire area is open to public view from above absent slight canopy coverage from a nearby tree. *See id.* Unlike in *Collins*, where the defendant's motorcycle was covered with a tarp and parked at the top end of his driveway, enclosed by two car-height brick walls and a wall of the home itself, the facts here do not reflect any

attempt to keep the Sentra and its contents private. And although Beasley suggests that nearby foliage from the trees might conceal the driveway from airborne drones or a Google Maps satellite, that is irrelevant because the Sentra was parked such that it was on open and obvious display to anyone using the adjacent public sidewalk. Under these circumstances, the Sentra was not within the curtilage despite being partially parked on a residential driveway.

Second, even if the Sentra had been within the residence's curtilage at the time of the search, I would still conclude that Beasley lacked curtilage standing because he failed to establish "an unrestricted right of occupancy or custody and control of the premises." *Baron-Mantilla*, 743 F.2d at 870. At the suppression hearing, Beasley provided no evidence that he paid rent or contributed to utilities at the residence. *See* Hr'g Tr. at 20:14–20. And during the arrest, Beasley told Cincotta that he did not live "out here," instead claiming to live elsewhere with Durden. BC at 22:37:38–41. Finally, Beasley's motion concedes that he only "frequented and occasionally stayed" at the residence. MTS at 17. Thus, although Beasley may have stored some of his personal effects and kept his dog at the residence, *see* Hr'g Tr. at 13:14–14:7, I conclude that he was at most "occasional[ly] presen[t]" as a "guest or invitee," *Baron-Mantilla*, 743 F.2d at 870

(quotations omitted). That cannot convey curtilage standing under Eleventh Circuit precedent.[5]

For these reasons, Beasley lacks curtilage standing. Thus, I need not address the open question of whether *Collins* extends to a situation where the record reflects that the traffic stop occurred simultaneously to the car pulling into the driveway. *See Collins*, 138 S. Ct. at 1673–74 (distinguishing an earlier Supreme Court case, *Scher v. United States*, 305 U.S. 251, 255 (1938) (upholding the warrantless search of a car within the curtilage), on the grounds that *Scher*'s reasoning sounds "most appropriately" in hot pursuit).

### B. The Traffic Stop Was Reasonable

Having established Fourth Amendment standing, Beasley argues that I must exclude the firearm and "any derivative evidence" from the search of the Sentra as fruit of an unlawful traffic stop. MTS at 1, 14–16. The United States responds that the stop was reasonable because Cincotta had probable cause to believe that Beasley had violated multiple Florida traffic laws. Resp. to MTS at 9–11. I agree with the United States.

A traffic stop is constitutional if the officer had reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur. *United States v. Campbell*,

---

[5] Neither was Beasley an overnight guest. *See United States v. Maxi*, 886 F.3d 1318, 1326 (11th Cir. 2018). Beasley told Cincotta that he was on a mission to fix the Sentra's trunk, Hr'g Tr. at 27:7–9, and Durden testified that she had sent Beasley to the residence on an errand, *id.* at 14:8–16. So although Beasley does appear to have intended to visit the residence, his presence would "only [have been] for a brief commercial transaction," which does not confer Fourth Amendment standing. *Maxi*, 886 F.3d at 1326.

26 F.4th 860, 880 (11th Cir. 2022) (en banc). "In other words, an officer making a stop must have a particularized and objective basis for suspecting the person stopped of criminal activity." *Id.* (quotations omitted). Even a minor traffic violation is enough. *Id.* Cincotta testified that he stopped Beasley based on two facts: (1) the Sentra was running without lights after dark, and (2) the Sentra's loaded trunk was open and unsecured. Hr'g Tr. at 24:4–23. If true, each fact independently gives rise to reasonable suspicion of a violation of Florida traffic law and justifies initiating a stop. *See Campbell*, 26 F.4th at 880 (minor traffic infractions sufficient); § 316.217(1)(a), FLA. STAT. (use of headlights required when driving after sunset); *id.* § 316.520(1) ("A vehicle may not be driven or moved on any highway unless the vehicle is so constructed or loaded as to prevent any of its load from dropping, shifting, leaking, blowing, or otherwise escaping therefrom.").

I credit Cincotta's account of the stop, as footage from his body-worn camera broadly corroborates his testimony. Beasley has introduced no evidence to support any other finding. Turning to the underlying offenses, I conclude that Cincotta had reasonable suspicion to stop the Sentra on both grounds. First, although Beasley now denies that the Sentra's headlights were off, he admitted the opposite on a recorded phone call while in custody. RC at 9:27–37. Although some of Beasley's statements on that call were no doubt falsehoods meant to impress the person to whom he was speaking (the inference being she was a paramour), the lies revolved around a desire to prevent one woman in his life from

12

learning about another. *See id.* at 8:44–50, 9:20–31. Nothing about this attempt to conceal a relationship casts doubt on the truth of Beasley's colorful admission, while explaining why he believed that he would ultimately not be convicted, that he had forgotten to turn on the Sentra's headlights that evening. *See id.* at 9:27–37.

Even if Beasley's contentions about his headlights were correct, Cincotta would still have possessed reasonable suspicion based on the Sentra's unsecured trunk. Although nothing fell out of Beasley's trunk before Cincotta decided to pull him over, body-worn camera footage shows that the trunk was unsecured and items were visible inside. *See, e.g.*, BC at 22:31:17–21. Whether the exact harm Section 316.520(1) protects against materializes, any officer observing a vehicle driving down the road with a trunk that is (1) loaded, and (2) clearly unsecured, would have a "particularized and objective basis for suspecting" that the driver was violating Florida law. Indeed, Durden testified that she knew officers might have exactly that reaction, which is why she sent Beasley on an errand to have the trunk fixed. Hr'g Tr. at 14:8–16, 16:19–17:11.

Beasley's argument to the contrary—that the Sentra's trunk was loaded in a meticulous way that made it impossible for its cargo to "drop[], shift[], leak[], blow[], or otherwise escap[e] therefrom"—amounts to a claim that Cincotta made a factual mistake when observing the trunk. From behind. While moving. In the dark of night. But reasonable mistakes, whether of fact or of law, do not defeat reasonable suspicion to render

13

an otherwise permitted stop unlawful. *See Heien v. North Carolina*, 574 U.S. 54, 57 (2014).

### C. Searching the Sentra Was Reasonable Under the Automobile Exception and Did not Unlawfully Prolong the Stop

Beasley next challenges the warrantless search of the Sentra, arguing that it was not justified by the automobile exception and that it unlawfully prolonged the stop in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015). MTS at 14–16. Both arguments fail.

#### 1. The Automobile Exception

To start, the warrantless search of the Sentra was lawful. "Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019) (quotations omitted and alterations adopted). And under longstanding Circuit precedent, the smell of marijuana emanating from a vehicle is enough to provide probable cause. *Merricks v. Adkisson*, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("[T]he smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle."); *see also United States v. Williams*, 731 F. App'x 863, 867 (11th Cir. 2018) (per curiam) (collecting "a long line of cases, [where the Eleventh Circuit has] held that the smell of marijuana coming from a person's house or vehicle establishes probable cause for a search").

14

The automobile exception applies in the light of Cincotta's observation that the Sentra was emanating the smell of marijuana and the fact that there appeared to be cannabis products stored in the vehicle. Beasley also admitted to Cincotta that he did not have a state-issued medical marijuana card, an odd statement without clarification if he were smoking anything but marijuana. Beasley's brief makes two arguments that this exception does not apply, but neither are meritorious. First, he says, Cincotta could not be sure that what he was smelling was illegal marijuana and not legal hemp. Again, that is, at most, a reasonable mistake of fact, especially given that Cincotta testified that never once in his career—over the course of hundreds of similar interactions—did the cannabis product in question turn out to be legal hemp. Hr'g Tr. at 90:8–13; *see Heien*, 574 U.S. at 60–61 ("[I]f officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description, neither the seizure nor an accompanying search of the arrestee would be unlawful."). Common sense and the realities of our modern society confirm Cincotta's police experience that he smelled marijuana, not hemp. And, as it turns out, it was not a mistake of fact after all.

Second, Beasley claims that the automobile exception is inapplicable because the Sentra was parked on curtilage. MTS at 18 (citing *Collins*, 138 S. Ct. at 1675). As I

explained above, however, this argument fails at the threshold because Beasley lacks any basis to assert the curtilage standing necessary to trigger this exception-to-the-exception.

At the suppression hearing, Beasley raised an unbriefed third argument, that the Sentra was not "readily mobile" because it was partially parked in a driveway with police vehicles between it and the nearest road. *See* Hr'g Tr. at 118:2–119:6. Aside from being forfeited, this argument is wrong. Yes, the automobile exception requires that a vehicle be "readily mobile." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). But that refers to basic functionality, not the practical ability to flee from police unhindered. *Id.* at 1293 ("The requirement of mobility is satisfied merely if the automobile is operational." (quotations omitted)), 1293 n.6 ("[T]he requirement . . . is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning." (quotations omitted and emphasis in original)). Any other conclusion would mean that the automobile exception would almost never apply, as I am unaware of any practice of conducting traffic stops and subsequent searches while the vehicle to be searched is running and the driver is free from detention. Indeed, such a practice would pose an unacceptable risk to officer safety. Beasley has cited no authority that would compel this odd result.

## 2. Prolongation

Beasley next argues that the search unlawfully prolonged the traffic stop because the stop's initial business, dealing with Beasley's minor traffic infractions, had concluded once

Cincotta suggested those violations would not be an issue. MTS at 14–16. This too, is

wrong. To be sure, under *Rodriguez* "officers cannot unlawfully prolong a stop," once

lawfully initiated, without violating the Fourth Amendment. *Campbell*, 26 F.4th at 881.

An officer does not prolong a traffic stop, however, when he undertakes "ordinary inquiries

incident to" the stop. *Rodriguez*, 575 U.S. at 355 (quotations omitted). "Typically such

inquiries involve checking the driver's license, determining whether there are outstanding

warrants against the driver, and inspecting the automobile's registration and proof of

insurance." *Id.* Officers may also "attend to related safety concerns" without unlawfully

prolonging a stop. *Id.* at 354. In other words, "to unlawfully prolong, the officer must (1)

conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the

stop (3) without reasonable suspicion." *Campbell*, 26 F.4th at 884 (footnote omitted). For

the same reasons I concluded that the automobile exception applies, Cincotta's knowledge

that the Sentra smelled like marijuana, that there appeared to be cannabis products stored

in the vehicle, and that Beasley lacked a medical marijuana card, all mean that there was

probable cause to conclude that there were illegal drugs in the car. *Merricks*, 785 F.3d at

560 n.3. Because Cincotta developed this separate suspicion upon beginning to question

Beasley, *see* Hr'g Tr. at 26:18–25, 87:19–25, searching the Sentra became justified before

the stop's animating mission concluded. Thus, Cincotta did not unlawfully prolong the stop.

### D. Beasley's Initial Confession Must Be Suppressed

Finally, Beasley moves to suppress his initial confession to Cincotta that there was a firearm in the vehicle on the grounds that it was coerced by a promise of leniency. MTS at 18–19. The United States responds that the confession was spontaneous and voluntary. Resp. to MTS at 15–16. In evaluating whether Beasley's initial confession was voluntary, I "look to the totality of the circumstances." *Lall*, 607 F.3d at 1285. Here, I agree with Beasley, in part.

Cincotta's conversation with Beasley before learning about the firearm is best understood as a series of questions about potential crimes: What's going on with the trunk? Do you have a driver's license? Have you been smoking? Do you have a medical marijuana card? Is there any marijuana in the car? And although Beasley answered most of these questions by essentially confessing to the relevant conduct, Cincotta assured him each time that his admissions would not result in any sanction (or at least not a severe one). Cincotta explained that the traffic violation for an unsecured trunk was no "big deal" and that he would not issue a ticket. He was also "not too worried" about the fact that Beasley was driving without a license. And when asking about marijuana, Cincotta explicitly stated that

"I'm not worried about the weed. If you got [sic] a little bit of weed in here, you're not going to jail for some stupid-a** weed, alright?" BC at 22:36:08–17.

Beasley argues that the last thing Cincotta said to him before the initial confession—"I just want you to be honest and upfront with me, that's why I'm asking"—was another question in this series, and that it carried the same implied promise of leniency established by Cincotta's practice over the course of the stop. *See id.* The United States responds that the alleged promise of leniency was—at most—implied, and that such promises ordinarily rise to the level of Fifth Amendment violations only when explicit. *See* Hr'g Tr. at 125:21–127:9; *Lall*, 607 F.3d at 1283 (promising leniency contradicted a previous *Miranda* warning and rendered a confession involuntary when detective "told [the defendant] that he was not going to pursue any charges against him" before soliciting the confession). One final note on the totality of the circumstances. Just before delivering the "honest and upfront" comment, Cincotta explained three things to Beasley: (1) he was about to detained, (2) police were about to search the Sentra, and (3) he would be "good to go" so long as "nothing crazy" turned up. BC at 22:35:57–22:36:06. Although at this point Beasley had not yet been read his *Miranda* warnings, he has chosen not to argue that Cincotta's final pre-confession comment was a custodial interrogation such that the failure to provide *Miranda* warnings would be a freestanding Fifth Amendment problem. Still, I consider

these circumstances as part of the totality when evaluating whether Beasley's initial confession was voluntary.

The question of voluntariness is extremely close. On the one hand, Cincotta's questioning until then in the stop did sound in a theme of leniency-for-honesty. On the other hand, the questioning's theme was also much less explicit than the promise of non-prosecution that rendered a confession involuntary in *Lall*, and the "honest and upfront" comment could have been understood as a statement more than a question. And as the Eleventh Circuit has explained, there is no such thing as a per se involuntariness rule when a confession is "preceded by any direct or implied promises, however slight." *Lall*, 607 F.3d at 1285 (quotations omitted). Instead, "the issue of voluntariness must be determined by examining the totality of the circumstances." *Id*. On these facts, the deciding factor is whether Cincotta intended, and Beasley understood, the "honest and upfront" comment as a question akin to the ones that had come before or as a simple statement of preference. Both the body-worn camera footage and Cincotta's sworn testimony establish that Cincotta meant the line as a question to Beasley about whether there was any other contraband in the vehicle beyond perhaps some marijuana. *See* BC at 22:36:14–17. ("I just want you to be honest and upfront with me, *that's why I'm asking*." (emphasis added)); Hr'g Tr. at 36:12–18 (**Q:** "And so, Officer Cincotta, when you spoke to Mr. Beasley, after you told him that you were going to search the car, did you even ask him if there was a

weapon in the car or did he volunteer that there was a weapon in the car?" **A:** "*I asked him if there was any other contraband in the vehicle* and then he volunteered the weapon." (emphasis added)). Just as I did in the Fourth Amendment analysis, I credit Cincotta's account of events, especially given its consistency with Beasley's immediate response volunteering the presence and location of the firearm. Thus, in the light of the totality of the circumstances, I conclude that Beasley's initial confession was not voluntary and must be suppressed.

To be clear, that I suppress Beasley's initial confession does not mean that the United States may not introduce the second confession, which was made almost a half-hour later and after Beasley was provided all his warnings. "The United States Supreme Court has never held that an early inadmissible statement automatically precludes the admission into evidence of later voluntary statements." *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984). Instead, later confessions can be considered voluntary if the "distinction is justified by a sufficiently isolating break in the stream of events." *Id.* Thus, the second confession is admissible if "the coercion surrounding [Beasley's initial confession] had been sufficiently dissipated so as to make the second statement voluntary." *Id.* at 773. Cincotta's body-worn camera captured complete audio and video of both confessions. The second confession, given roughly twenty minutes after the first, displayed no indicia of coercion and appears to have been knowingly and voluntarily made. Beasley had not spoken to

Cincotta for almost a half-hour—a "break in the stream of events." *Leon*, 734 F.2d at 772. By then it had become clear, especially after Cincotta took pains to ensure that Beasley was appropriately warned despite Beasley's initial suggestion that he was familiar with *Miranda*, that whatever implied suggestions of leniency may have been once conveyed, confessing would not shield Beasley from liability. Indeed, the impetus of the second confession appears to have been a desire by Beasley to distance Durden from association with the gun, rather than to protect himself. On balance, I conclude that whatever coercion accompanied Beasley's initial confession had sufficiently dissipated to render his second confession knowing and voluntary.[6]

Similarly, that I exclude the initial confession is irrelevant to whether the firearm or any other physical evidence must be suppressed. Cincotta had already decided to detain Beasley and search the Sentra before delivering the "honest and upfront" line and soliciting Beasley's initial confession. Cincotta said so explicitly on the recording. BC at 22:35:25–50; Hr'g Tr. at 34:18–24. Because a lawful search that would have uncovered the firearm had been set in motion, the United States has shown that its discovery was inevitable despite any Fifth Amendment problem. *McKathan v. United States*, 969 F.3d 1213, 1232 (11th

---

[6] This result is consistent with Beasley's position at the suppression hearing, where he appeared to argue that a favorable ruling on his Fifth Amendment challenge would require excluding the firearm but not Beasley's second, post-*Miranda* confession. Hr'g Tr. at 116:17–23.

Cir. 2020) (explaining that "[t]he inevitable-discovery doctrine can apply when a Fifth Amendment violation occurs").

## IV.    CONCLUSION

Accordingly, Defendant's Motion to Suppress (Doc. 35) is **GRANTED in part** and **DENIED in part**. Beasley's initial confession that there was a firearm in the Sentra is suppressed, but the United States may introduce his later, post-*Miranda* confession. The United States may also introduce any evidence derived from the lawful search of the Sentra, including the firearm Beasley is charged with illegally possessing.

**ORDERED** in Tampa, Florida, on October 27, 2023.

Kathryn Kimball Mizelle
United States District Judge